Please call. Last case, 4-12-0806, W.C. Joanne Doyle v. Workers' Compensation Comm'n. First shall be the last. And the last shall be first. Good afternoon. May it please the court. My name is Mary Massa again, and I am representing here today Joanne Doyle and her appeal to this court. She has claimed repetitive trauma injuries not only to her hands and wrists on both sides, but also to both elbows and both shoulders. And she has claimed that they resulted from her employment duties in the alcohol department of ADM corn sweeteners. And she claimed that this particular job she had at ADM, she had worked for several years, but this particular job, she started in January of 2009, and that's when she started having symptoms not only in her hand, her right hand, but both hands as well as both elbows and both shoulders. Now, the employer did stipulate that Ms. Doyle gave notice of those injuries in September of 2009, but the arbitrator determined that all of her claims were barred by the statute of limitations and by failing to give proper notice in September of 2009 because she had many of these upper extremity conditions prior to September 9, 2009, which was the alleged manifestation date of her repetitive trauma injuries. While the commission majority did affirm the arbitrator on this case, I think Commissioner Mason's dissent is pretty telling both with regard to the denial of her claim on the statute of limitations basis, but also on the denial of her claim based on accident and causal connection. With regard to the hands, first of all, there is evidence in the record that she had sought treatment for her right hand back in 2000. She evidently treated with several Dr. Billiou at a family practice clinic, and she did see a Dr. Billiou in April of 2007. He did reference in his office note that she had a positive Tonell sign in her right hand, but her only complaint at that time was that she had these symptoms when she was sleeping, so there wasn't any connection with work, and there wasn't any diagnosis at that time of carpal tunnel. But again, it's just the right hand that was involved. In 2006, she went back to see a Dr. Billiou because she had fallen on the ice, and she was complaining of not being able to close the third and fourth fingers on her right hand. The doctor diagnosed tendinitis, and it didn't affect her work. There wasn't any other treatment, and again, it only affected the right hand, not the left hand. Doesn't this case really ultimately boil down to the testimony of Barnes, their doctor, and Grady? With regard to the statute of limitations matter? No, not the statute of limitations, with regard to the causal connection issue. The causal connection, yes, absolutely. It's a battle between Dr. Barnes' reliability of his testimony versus that of Dr. Grady. And the commission ultimately agreed with Barnes, right? The arbitrator did agree with Barnes, Your Honor. And Commissioner Mason, in her dissent, talked at length about how Dr. Barnes' reliability on the causation issue was not... But are we reviewing the dissent, or are we reviewing the majority of the decision, or the commission? Who are we reviewing? We are reviewing the commission majority, and... So where did they go wrong? Dr. Barnes was their company doctor. He did a job evaluation. He did not speak with my client about her job. He did not observe her performing her job. He may have picked up a tool that she did, but didn't engage in the actual performance of using a wrench or the other heavy tools. However, he did provide a detailed description of her job duties, correct? He did, Your Honor. And my client said that she agreed with that job description, except for the fact that she believed she worked on more like 8 to 12 rail cars per day, as opposed to the average 8 per day that Dr. Barnes... Ms. Cappelletti is going to say, hey, with regard to Grady, the record shows his opinions were not based upon a complete review of the claimant's medical history, or full knowledge. So that's... She's going to come back and say similar things about Grady, right? Well, Dr. Grady, she was a... I don't want to anticipate her argument, but I'm just looking at the record. Board-certified orthopedic surgeon. He was privy to her job duties. He had discussion with her about her job duties. There was also a hypothetical presented to him during his deposition about her job duties, and he testified that her job duties were a cause in either a causal relationship or an aggravation... What I'm trying to get to, as you know, as an experienced attorney, the commission's job to weigh the credibility of the witnesses, the credentials, and the medical testimony, is it not? Yes, Your Honor. And they chose Barnes over Grady. Yes, Your Honor. And my position is that taking that position was against the manifest way to the evidence. Now, if you look at other factors that can at least cause carpal tunnel, and I don't really think that there was much said in Dr. Barnes' report with regard to the impact that her work, which she said, at least with regard to the shoulders, when she did work that was at shoulder height or above, that's when she noticed pain in her shoulders, as well as the pain in the elbows. Now, Dr. Barnes did not refer that much to that in his job evaluation, Your Honor. With regard to the carpal tunnel, though, in this case there was no testimony that some other outside condition was the sole cause of her condition. And under CISPRO, it only has to be a causal factor in the resulting condition of ill-being. And I think Dr. Grady's testimony quite clearly sets forth that it was at least a cause in aggravating a preexisting condition or causing the condition in this lady. This lady didn't have any shoulder problems or elbow problems prior to September, or prior to working in the alcohol department starting in January of 2009. There was a medical record of her having shoulder complaints in her right shoulder back in 1992 when she was in high school. But the main left shoulder problem in this case had to do with the left shoulder. That's the one that Dr. Grady believed she needed surgery on, as well as the elbow. There's no other medical treatment on the elbow that's of record in this case before September of 2009. She did not have diabetes. She did not have a thyroid condition. She did not have hypertension, all of which are comorbid conditions that may affect or impact the hands. She had no problem whatsoever with her left hand prior to having worked in this department starting in January of 2009. And it wasn't until after Dr. Barnes sent her for electrodiagnostic studies when she reported the accident in September of 2009 that she actually had EMG nerve conduction studies on both of her hands that showed that she did have mild bilateral carpal tunnel syndrome. And she also was shown to have a problem in the elbow, ulnar neuropathy in the elbow as a result of these nerve conduction studies. So it is our position that Dr. Barnes, while he may have talked to a couple of employees, he might have visited the job site, he might have picked up a tool, did not even speak with my client about her job duties or what it was about her job duties that caused her to have these complaints. And Dr. Grady did. Dr. Grady was also a board-certified orthopedic surgeon, and as Commissioner Mason noted, that kind of credential was not found or presented in evidence with regard to Dr. Barnes, the company physician. With regard to the statute of limitations, our position is that, especially with the left hand, there was no treatment prior to September of 2009. So for the arbitrator and the commission to find that the statute of limitations was blown on the left hand, there's just nothing in the record to substantiate that. With regard to the elbows, again, there's nothing in the medical records to indicate that she had any kind of problems with the elbow prior to starting this job, which she said initiated the complaints that she had in her elbows, her hands and her shoulders. And with the shoulder, the left shoulder was the problem that had the most problem, and the only medical treatment she had prior to this point in time was her right shoulder, and that was back in 1992. She only had seen the doctor once for that, and it was rather inconsequential in terms of treatment or continuing problems. Certainly there was nothing in the records to indicate that. For these reasons, we would ask the court to reverse the commission's decision and remand the case to the commission for consideration of my client's request for medical benefits under Section 8A, and also for the prospective surgical treatment to the left elbow and the left shoulder that was recommended by Dr. Grady. Thank you. Thank you, counsel. Counsel, you may respond. Good afternoon, Justice and counsel. Elizabeth Capoletti on behalf of ADM Corn Sweeteners. I would respectfully submit to you that the decision of the commission is supported by the manifest way of the evidence and should be affirmed. With all due respect to counsel, relative to the statute of limitations argument, I don't believe the commission ever made any finding relative to the statute of limitations. The decision was based pretty much solely on accident, and what they found was that the claimant failed to prove that her job duties were the repetitive cause of her resulting condition of well-being, and they found that there was a failure of accident. Therefore, it follows that there was a failure of notice because there was no notice, and it follows that because there's no accident, there's no causation. They came to their decision by listening to the claimant's detailed testimony as to what her job duties required, and they listened to the opinions of Dr. Barnes, and they listened to the opinions of Dr. Feeney. They weighed all that evidence, and they sided with Dr. Barnes. That's what it was. I appreciate the fact that Dr. Feeney says something different. He does give a somewhat causation opinion, but he does also say in his testimony, I believe, that four cars wouldn't be repetitive enough, up into eight cars, and he wasn't even quite sure what the number of cars would be repetitive enough to actually cause the resulting conditions of well-being. Dr. Barnes did, in fact, do a very comprehensive analysis of her job duties. He went and he saw it, and I believe he did actually consult with the claimant after he performed the job analysis and confirmed that these were, in fact, her job duties. You know, I had a question about Dr. Barnes, and that deals with his background or training. Do you know? I don't know, per se, what he is. I mean, I know that they're obviously, the client is taking issue with the fact that he's a company physician, but I don't know, per se, if he was an orthopedic physician or if he was just a general occupational med doctor. And honestly, I don't know, sitting here, if that's actually in the record or not. I'm not sure if those credentials were actually put into the record. But I still, still that is a function of the commission to review the doctor's testimony and to weigh their credibility, and still they felt that Dr. Barnes' testimony was more credible to them. I mean, they placed more weight on Dr. Barnes' testimony because he did, in fact, go and look at the job duties. And I think they also placed weight on his testimony in conjunction with the claimant's actual description of her job duties. I mean, she did describe pretty specifically what her job duties were. And this isn't a job where she was making widgets all day long on an assembly line. I mean, she was doing numerous different tasks. She was a switch man. She was driving the engine. She was driving a mobile track, I think. She was also unloading and loading these rail cars, which did require her to do a 62-point inspection before she ever got to the point where she would get on top of the rail car and use the brass wrench to undo the bolts. And I think there were about six or eight bolts. And it really seemed from her testimony that that was where she was complaining that there was a causative factor with her. But that was only done, you know, four times, possibly four times a day, up to 12 times a day. And some days, no times. And when, after she took the top of the rail car off, she would attach a hose and she would put a spout in. And then she would wait and go and do paperwork. So her job duties were particularly varied throughout the day. And I think that that was also part of what the commission heard in conjunction with Dr. Barnes's opinion that he did not believe that those job duties were of a repetitive nature to cause her ongoing problems with her arms. So I would just respectfully request that you affirm the decision of the commission, because there is evidence in the record to support the decision. Thank you. Thank you, counsel. Counsel, you may reply. The case law provides that a job doesn't have to be assembly line in nature for repetitiveness to be found. The city of Springfield case, I think, specifically says that the fact that an employee's work duties are varied during the day does not negate the fact that it can be a repetitive type job. In that particular case, the employee had a lot of different jobs. The jobs would vary day to day, but they were all repetitive in nature and they were all hand intensive in nature. The Edward Hines Precision Components case also says that there's no legal requirement that a certain percentage of the work day be spent on a task in order for the work duties to negate a finding of repetitive trauma. And the issue is, were the work duties repetitive enough? Now, this lady had to use a large brass T-bar to open the top of the rail car that she had to forcibly hit with her hands to open. She used a very large wrench on the bottom of the cars. This is the wrench that Dr. Barnes held but didn't use to simulate this particular job duty. She also had to drive a bobcat. She had to release brakes. She had to lift heavy lids. And those were just some of the job duties that she testified to and that were particularly discussed with Dr. Grading. So I think when you look at her testimony as a whole, when you look at Dr. Grading's testimony as a whole, despite the fact that this lady's job duties were varied in the working on these average eight rail cars per day, there is sufficient evidence and, in my opinion, overwhelming evidence that this lady's job was repetitive. And when you couple that with her testimony that it wasn't until she started doing this particular job in January of 2009 that the symptomology, the extreme symptomology that she hadn't had prior to this point in time was initiated, then I think Dr. Grading's opinion on causation should be entitled to much more weight than either the arbitrator or the commission majority gave it. And for that reason, we would ask that you would reverse the commission majority and send it back down to the commission for consideration of awards of medical and prospective medical. Thank you very much. Thank you, counsel. The matter will be taken under advisement. The brief disposition shall issue. The court will stand at recess until tomorrow at 9 a.m.